**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MELVIN KERNS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0431-WS-B** |
| | ) | |
| **MARK SEALY, d/b/a PRO-FOAM OF** | ) | |
| **SOUTH ALABAMA, INC.,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on the following evidentiary motions: (i) Plaintiffs'
Motion to Strike Paragraph 4 of Paul Mark Sealy's Affidavit (doc. 40); (ii) Plaintiffs' Motion in
Limine to Preclude the Testimony of Larry Creel as Expert Witness (doc. 42); (iii) defendants'
Motion in Limine and to Strike Exhibit H to Plaintiffs' Reply Brief to Defendants' Motion for
Summary Judgment (doc. 47); and (iv) defendants' Motion to Strike Testimony of Plaintiffs'
Expert Gordon Damant (doc. 50).  All of these Motions have been briefed and are ripe for
disposition.[1]

**I.      Background.**

This action arises from a fire at a partially constructed house belonging to plaintiffs,
Melvin and Pauline Kerns, and located in Gulf Shores, Alabama.  On November 8, 2005,
representatives of defendant Pro-Foam of South Alabama, Inc. (including defendant Mark Sealy
and non-party John Frank) were applying spray-on polyurethane foam insulation in the attic of
the Kernses' house pursuant to a contract between Pro-Foam and the Kernses when a fire started
in the attic in the southeast corner of the home, in an area where the defendants had applied foam

---

[1]      Also pending is defendants' Motion for Summary Judgment (doc. 31).  Because
many of these evidentiary motions relate to factual matters that may prove critical to the Rule 56
analysis, however, the Court will resolve these preliminary motions first.  A separate order will
be entered with respect to the Motion for Summary Judgment, taking into account the rulings set
forth herein.

insulation a short time earlier.  The City of Gulf Shores Fire Department was called to the scene to extinguish the blaze, which caused substantial damage to the structure.  The Fire Department attributed the fire to a possible spontaneous ignition, but also characterized the source of the fire as being unknown due to the lack of physical evidence.

Based on these events, plaintiffs filed suit in federal court against Pro-Foam and Sealy, alleging state-law causes of action for negligence, wantonness, breach of contract and res ipsa loquitur.[2]  In the course of litigating defendants' Motion for Summary Judgment, the parties have identified a series of emergent evidentiary issues as to which they cannot agree.

## II.    Plaintiffs' Motion to Strike.

In conjunction with their Motion for Summary Judgment, defendants submitted the Affidavit of Paul Mark Sealy (doc. 31, at Exh. 11) dated April 25, 2007.  Paragraph 4 of that Affidavit reads, in its entirety, as follows: "Pro-Foam of South Alabama, Inc. purchased the particular barrels of foam used on this application from Profoam Distribution, Inc., and Profoam Distribution, Inc. obtained these particular barrels of foam from the manufacturer Isotec International, Inc.  I learned after the fire that the manufacturer had possibly identified a core temperature problem with that formula."  (Sealy Aff., ¶ 4.)  Sealy specifically avers in his Affidavit that "the facts stated herein are within my own personal knowledge."  (*Id.*, ¶ 1.)

Plaintiffs argue that this entire paragraph should be stricken because it contains hearsay within hearsay, and violates the requirement of Rule 56(e), Fed.R.Civ.P., that "[s]upporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence."  *Id.*; *see also Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge.") (citation omitted).  In particular, plaintiffs protest that (a) Sealy does not have personal knowledge as to whether Profoam Distribution obtained the

_____

[2]     Federal subject matter jurisdiction was properly predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332, inasmuch as plaintiffs (despite building a residence in Gulf Shores, Alabama) are citizens of Georgia, and defendants are both of Alabama citizenship for diversity purposes.  The amount in controversy greatly eclipses $75,000, as the Kernses are seeking recovery of $200,000 or more for out-of-pocket repair expenses, mental anguish, and other alleged damages.

subject barrels of foam from manufacturer Isotec International, Inc.; and (b) Sealy lacks personal knowledge of whether Isotec had experienced a "core temperature problem" with the particular formula utilized in manufacturing the subject drums of chemicals mixed at the Kernses' house.

The law of this Circuit is clear that "when an affiant avers that his statements are based on personal knowledge, a district court is bound to accept [such] statements as true, unless the context demonstrate[s] otherwise." *HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp.2d 1232, 1238 (S.D. Ala. 2006) (citing *Martin v. Rumsfeld*, 2005 WL 1526465, *2 (11th Cir. June 29, 2005)). Here, Sealy represents that he has personal knowledge that Profoam Distribution obtained the foam from manufacturer Isotec, and that Isotec had possibly experienced a "core temperature problem" with the formula used in manufacturing that particular shipment. However, the context reflects that Sealy is plainly lacking personal knowledge of any problems Isotec may have experienced with the core temperature of its formula used in manufacturing those particular barrels of foam chemicals. Indeed, Sealy testified in his deposition taken on February 14, 2007 (two months before signing the Affidavit at issue) that his knowledge of a possible problem with Isotec's formula stems solely from reviewing deposition transcripts in separate litigation between Profoam Distribution and Isotec relating to other fires allegedly involving that product. (Sealy Dep., at 209-11.) From Sealy's own deposition testimony, it is evident that he has no personal knowledge of whether Isotec had core temperature problems with its formula in this shipment or any other, but that he is instead simply parroting back what he has read in deposition transcripts in unrelated litigation. These circumstances flunk the personal knowledge requirement. Moreover, there has been no showing by defendants that they will be able to reduce this information to admissible form at trial, so as to render it eligible for consideration on summary judgment notwithstanding the manifest infirmities in trying to introduce it through Sealy. *See Rowell v. BellSouth Corp*., 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *see generally Corwin*, 475 F.3d at 1249 ("[e]vidence inadmissible at trial cannot be used to avoid summary judgment") (citation omitted).[3]

---

[3]     In response, defendants advocate a "common sense approach" that "would allow this testimony, under these circumstances," pursuant to Rule 803(24), Fed.R.Evid. There is no

By contrast, there is no reason to doubt Sealy's averment that he has personal knowledge that his company, defendant Pro-Foam of South Alabama, Inc., purchased these barrels of foam from Profoam Distribution (an unrelated entity to Sealy's company, notwithstanding their very similar names), which in turn obtained those barrels from Isotec.  Nothing in the context demonstrates a lack of personal knowledge or invites skepticism of the veracity of Sealy's representation that he possesses personal knowledge of such matters.  To the contrary, it would be entirely expected and proper for the principal of a company to know the names of the distributor and manufacturer of the product that is the stock in trade of that company's business.[4]

---

Rule 803(24) in the Federal Rules of Evidence; however, it appears that defendants intend to invoke the "residual exception" of Rule 807, which allows a trial court under certain circumstances to admit otherwise inadmissible hearsay, provided that, *inter alia*, it has "circumstantial guarantees of trustworthiness" and "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."  Rule 807, Fed.R.Evid.  This exception cannot save Sealy's testimony on this point.  Simply put, there are no circumstantial guarantees of trustworthiness from Sealy testifying about a manufacturing defect in the foam based on his self-interested characterization of deposition transcripts from unrelated litigation, particularly when those transcripts may or may not relate to the formula used in producing the foam sprayed at the Kernses' house. Moreover, defendants have made no showing that they cannot procure equally or more probative evidence on this point through reasonable efforts.  All indications are that they can.  Defendants have not shown that they cannot subpoena an Isotec representative to testify about defects in the formula used for this particular batch of foam.  They have not shown that they cannot subpoena a Profoam Distribution representative to testify about other fires involving Isotec foam products manufactured using the same formula as that involved in this fire.  They have not shown that they could not hire an expert to test this actual batch of foam for a core temperature problem.  Therefore, this Court will not permit Sealy to testify about his interpretation of what he read in deposition transcripts from unrelated litigation under the aegis of Rule 807.  It is also no answer to argue, as defendants do, that Sealy should be permitted to testify on this point because plaintiffs' expert, Gordon Damant, testified that he "understood that Isotec made a formulation that was problematic at some point."  (Damant Dep., at 85.)  It is unclear what possible legal basis there might be for defendants' contention that some other witness's hazy, sketchy testimony on a point (testimony which defendants seek to exclude, in any event, via *Daubert* motion) can render Sealy's much more specific testimony admissible on that point, effectively curing his obvious lack of personal knowledge.  The Court will not take such an unwarranted leap of logic.

[4]    Plaintiffs' argument rests on stray statements by Sealy that he had never had personal contact with Isotec representatives, and that he had not seen an Isotec invoice until these proceedings began.  (Sealy Dep., at 213, 243.)  Of course, there is nothing inconsistent

It appears, then, that plaintiffs can reduce the statements in the first sentence of Paragraph 4 to admissible form at trial.  Accordingly, the first sentence of Paragraph 4 of the Sealy Affidavit is not in violation of Rule 56(e) and is properly considered for summary judgment purposes.

"When an affidavit contains inadmissible evidence, the court may strike the inadmissible portions of the affidavit and consider the rest."  *HomeBingo*, 428 F. Supp.2d at 1240 (citation omitted).  The Court will do precisely that here.  Plaintiffs' Motion to Strike is **granted in part** and **denied in part**.  The second sentence of Paragraph 4 of the Sealy Affidavit is **stricken** as contravening the personal knowledge requirement of Rule 56(e); however, the first sentence of that Paragraph 4 will be accepted and considered on summary judgment as it appears to be based on the witness's own personal knowledge.

## III.   *Daubert* Motions.

Next, the Court considers Plaintiffs' Motion in Limine to Preclude the Testimony of Larry Creel as Expert Witness (doc. 42) and Defendants' Motion to Strike Testimony of Plaintiffs' Expert Gordon Damant (doc. 50).  Because these motions involve the same types of legal challenges and the same governing legal principles, they will be considered together.

### A.   *Governing Legal Standard.*

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact."  *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005).[5]  In that regard, "[t]he court serves as a gatekeeper, charged with

---

with Sealy testifying that he had no direct dealings with Isotec and has not seen Isotec invoices, on the one hand, and that he has personal knowledge that Isotec manufactured the foam that Sealy's company purchased from Profoam Distribution, on the other.  In the absence of any tension between those statements, the context provides no basis for doubting Sealy's averment of personal knowledge in his Affidavit as to those facts.

[5]     Rule 702 reads as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness

-5-

screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin*, 475 F.3d at 1250. The Court's gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to lay the proper foundation to show admissibility of that expert testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, --- F.3d ----, 2007 WL 1743294, *5 (11th Cir. June 19, 2007); *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (similar). That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances of the particular case. *Brown*, 415 F.3d at 1267-68.[6]

_____

has applied the principles and methods reliably to the facts of the case." *Id.*

[6]    Furthermore, evidentiary hearings are not a mandatory condition precedent to determination of whether expert opinions are excludable under *Daubert*. *See Corwin*, 475 F.3d at 1252 n.10 ("although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *Cook*, 402 F.3d at 1113 (noting that trial court was under no obligation to hold a *Daubert* hearing, although such hearings may be helpful in complicated cases involving multiple experts). Here, plaintiffs have not requested a *Daubert* hearing on their Motion in Limine concerning the testimony of defendants' expert, nor have defendants requested such a hearing in their corresponding Motion to Strike the testimony of plaintiffs' expert. More importantly, the Court's review of the record reflects that no hearing is necessary to ascertain whether these proposed expert opinions are consistent with the threshold criteria of Rule 702 and the *Daubert* line of authorities. For these reasons, no hearing

-6-

In applying these principles to the case at bar, the Court proceeds in recognition of appellate guidance that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert" or "because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Such circumstances may provide fertile ground for vigorous cross-examination at trial, but they do not constitute a permissible basis for excluding the testimony altogether under Rule 702 and *Daubert*.

### B.     Plaintiffs' Motion in Limine to Bar Expert Opinions of Larry Creel.

Plaintiffs seek to preclude defendants from introducing or relying on the expert opinions of Larry Creel for any purpose in these proceedings. Creel, defendants' expert witness, has extensive experience in the foam insulation industry. Indeed, Creel's résumé confirms that he was an applicator, supervisor, trainer and owner of various foam insulation businesses along the Gulf Coast on a continual basis from 1973 through 2006. (Doc. 49, at Exh. 2.) Creel's expert report articulates the following opinions: (1) Sealy applied the foam insulation to the Kernses' house in accordance with industry standards; (2) because the foam was applied correctly, defendants' application of such foam did not cause the fire; (3) defendants' attempts to discover a "hot spot" once they encountered an abnormal haze comported with industry standards; (4) there are a number of potential causes for the fire, but foam application "can be ruled out as a potential cause of the fire";[7] (5) "[i]f the foam used by Profoam of South Alabama, Inc. came from a defective batch with a core temperature or 'overheating' problem, then this defective formula is the most likely cause of the fire"; and (6) "there could have been some other irregularity or chemical defect in the batch of foam which caused it to ignite." (Doc. 49, at Exh.

---

will be conducted to explore these issues further.

[7]     Creel's report identifies these other potential causes as including an external cause of ignition such as static electricity or an ignition source in the eve (such as a smoldering cigar or cigarette), a chemical defect in the batch of foam's formula, or a chemical irregularity or defect of the foam. (*See* doc. 49, at Exh. 1.)

1.)

In their Motion in Limine, plaintiffs do not quarrel with the admissibility of Creel's opinions concerning whether defendants' activities were aligned with industry standards.[8] But plaintiffs do challenge the admissibility of Creel's purported "theory that the fire was caused by a 'defective batch' of chemicals sold by the manufacturer and used by the Defendants in the Plaintiffs [*sic*] home." (Plaintiffs' Brief (doc. 43), at 3.) Plaintiffs decry this opinion as "pure speculation" and as a "troublesome opinion" because, they contend, Creel has no evidence that a defective batch of foam was used and has never tested the foam products used by defendants at the plaintiffs' home. (*Id.*) In support of their position, plaintiffs cite excerpts from Creel's deposition wherein he testified that while there may have been a chemical defect in the batch of the foam's formula used at the Kernses' house, he has no evidence of any such defect and is unaware of any testing that may have been performed to determine whether any such chemical defect existed. (Creel Dep., at 75-76, 87-88.)

Interestingly, the opinion that a defective batch of chemicals actually caused the fire is not set forth anywhere in Creel's expert report. Far from opining that a defective batch caused the fire, Creel's report is decidedly more restrained, stating only that "[i]f the foam used by [defendants] came from a defective batch with a core temperature or 'overheating' problem, then this defective formula is the most likely cause of the fire." (Doc. 49, at Exh. 1.) Nothing in that report purported to state an expert opinion that the batch of chemicals was, in fact, defective; rather, Creel merely hypothesized that <u>if</u> that batch had a core temperature defect, <u>then</u> that core temperature problem likely caused the fire. Plaintiffs have not argued that Creel is not qualified

---

[8]     In particular, plaintiffs allow that Creel "is likely qualified to offer opinions as to the standard in the industry for application of the products used in this matter." (Plaintiffs' Brief (doc. 43), at 3.) Whether they concede that he is qualified to offer such opinions or not, plaintiffs certainly have not challenged Creel's testimony concerning industry standards and defendants' compliance with same, nor have plaintiffs suggested that Creel's opinions ruling out foam application as a cause of the fire are not competent and not admissible; therefore, those aspects of Creel's expert opinions are beyond the scope of this Motion in Limine and will be considered on summary judgment and at trial.

to offer such an opinion, and there appears to be no *Daubert* concern inherent in that opinion.[9]

But Creel went far beyond his expert report in his deposition.  In response to questions from defense counsel (*i.e.*, the very lawyers that had hired him), Creel embellished his opinion considerably, testifying for the first time that "the most likely cause of the fire" is a "core temperature" problem with the batch of foam.  (Creel Dep., at 89.)  When asked what facts he relied on in concluding that this batch had a core temperature problem, Creel testified that this opinion was based solely "on knowing what the chemical industry was doing in 2005, the changes that they were making, the problems that we heard were going on, the problems Isotech was having."  (*Id.* at 90.)  Thus, Creel would apparently tell the jury in this case that, in his opinion, the particular batch of foam used on the Kernses' house had a manufacturing defect with respect to its core temperature based solely on "problems that we heard were going on" in the "chemical industry ... in 2005."  (*Id.*)[10]  Creel performed no tests.  He made no chemical

---

[9]     That said, such a qualified, limited opinion based on an untested, unknown premise may be of precious little assistance to defendants at trial.  When Creel testifies that if the batch of chemicals were defective, that defect was the most likely cause of the blaze, plaintiffs will be free to elicit testimony on cross-examination confirming that Creel has no evidence and performed no testing tending to show that this particular batch of chemicals was defective, notwithstanding the ready accessibility of those batch chemicals for testing and analysis, thereby casting doubt on the key assumption on which that opinion rests.

[10]     Creel's own testimony reveals how untethered that opinion is from any factual mooring.  In explaining why he had relied exclusively on problems that he had heard were going on in the industry in 2005, Creel testified, "I mean, that's the only thing we can base it on.  Chemical formulation[s] continually change."  (*Id.*)  Thus, Creel would opine that this batch of chemicals must have had an overheating defect based on problems the industry as a whole was experiencing, even as he acknowledged that the chemical formulations used in manufacturing this foam were continually changing.  That constant state of flux in itself defies such a gross generalization about problems in the industry as any kind of reasonable basis for the opinion that the batch of chemicals was defective, inasmuch as Creel acknowledged that chemical formulations were changing from batch to batch during this time period, rendering it all the more important to have batch-specific evidence to establish some defect in that batch.  Moreover, whatever problems Creel may have been hearing about the chemical industry, he did not hear that they were making batches of foam that were a fire hazard, as he testified that "[a]t that time, in 2005, I didn't know that fire was a problem."  (*Id.* at 91.)  So he would testify to the jury in this case that he believes the batch of foam applied by defendants had a core temperature problem, rendering it a fire hazard, based on things he had been hearing about the chemical industry in 2005, even though he never heard in 2005 that these foam products were being

examination or inspection of this batch of foam, even though defendants have preserved that batch and it is apparently accessible and available for testing to confirm or deny whether the batch of chemicals had a tendency to overheat.  Yet these omissions did not stop Creel from testifying emphatically and unequivocally that "the cause of the fire was the chemical that was being used.  There was a problem with that batch.  It was too hot.  Core temperature caused the problem, and the fire was a result of the core temperature."  (*Id.* at 103-04.)[11]

There is no *Daubert* problem with Creel testifying that, in his view, defendants correctly applied the foam in accordance with industry standards, such that foam application could not have caused the fire.  *See Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) ("Expert testimony on industry standards is common fare in civil litigation.").  There is similarly no Rule 702 impediment to Creel testifying that there were a number of other potential causes to the fire, including (a) a chemical formula defect that caused a core temperature problem in that specific batch, (b) an external cause of ignition, or (c) static electricity.  (Creel Dep. at 103-04; doc. 49, at Exh. 1.)  Nor is there any problem with Creel offering a hypothetical opinion that <u>if</u> the batch of foam were defective and had a core temperature problem, then that problem was the most likely cause of the fire.  (Doc. 49, at Exh. 1.)  *See Levin*, 459 F.3d at 79 (citing authority for proposition that an expert may offer opinions based on assumptions that are not contrary to trial evidence).  Creel's expert opinions have included all of those facets, and he may testify as to same at trial.

But Creel's opinions that the "most likely" explanation is a core temperature problem, that "[t]here was a problem with that batch," and that "the fire was a result of the core temperature" amount to mere speculation and overreaching of his demonstrated expertise, devoid of any of the indicia of reliability which *Daubert* and Rule 702 demand.  Creel testified to no factual basis for ruling out an external cause of ignition or static electricity; to the contrary, he admitted that has no absolutely no expertise in cause or origin of fire investigation.  (Creel Dep.,

_____

formulated in a manner that might constitute a fire hazard.

[11]     This absolute testimony that "[c]ore temperature caused the problem" cannot be reconciled with Creel's testimony on the very next page of his deposition that "it's possible that a static charge was there.  I mean, yeah, I mean, it's possible" that static electricity (and not a core temperature problem) could have caused the fire.  (*Id.* at 105.)

at 104.)  He testified to no investigation, inspection or analysis that might have conclusively ruled in a core temperature problem to the exclusion of other possible causes, but rather chalked up the fire to a defective batch of chemicals based solely on the "problems that we heard were going on" in the "chemical industry" in 2005, none of which rumors and scuttlebutt related to fire hazards.  There was no discernable methodology and no discernable scientific or technical ground for that conclusory opinion, which contradicted other parts of Creel's deposition in which he admitted the existence of other possible causes that he been unable to rule out.  This aspect of Creel's testimony more closely resembles a lawyer's closing argument than an expert's considered opinion, and would be unhelpful to the jury.  *See Cook*, 402 F.3d at 1111 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.") (citation omitted).  Furthermore, Creel's opinions on this point are properly excluded as testimony "that is 'imprecise and unspecific,' or whose factual basis is not adequately explained."  *Id.* (citation omitted); *see also Rink*, 400 F.3d at 1292 (explaining that *Daubert* condemns expert testimony that amounts to a scientifically unsupported "leap of faith");  *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted); *Pell v. E.I. DuPont De Nemours & Co.*, 231 F.R.D. 186, 192 (D. Del. 2005) (mere personal belief of expert witness as to weight of the evidence is properly excluded).[12]

Creel's guesswork and subjective impressions, based on vague, non-fire related things that he had heard about the industry, are insufficient to render reliable his opinions that the batch of chemicals in the foam used at the Kernses' house was actually defective and was the actual cause of the fire or to provide any meaningful assistance to the trier of fact.  Creel will therefore

---

[12]      *Michigan Millers* concerned the district court's exclusion of an expert's opinion that a fire had been intentionally set where that expert had been "unable to rationally explain how he came to that conclusion."  *Id.* at 921.  Because the expert offered nothing more than his *ipse dixit* to link that conclusory opinion to the facts, the Eleventh Circuit concluded that the district court did not abuse its discretion in excluding that opinion.  This case is similar.

be precluded from testifying as to those opinions at trial, pursuant to *Daubert* and Rule 702.[13]

### C. Defendants' Motion to Strike Testimony of Gordon Damant.

Just as plaintiffs have sought to preclude the opinions of defendants' expert on *Daubert* grounds, defendants seek like relief as to plaintiffs' expert, Gordon Damant, challenging both his qualifications to render his opinions in this case and the adequacy of the foundation for those opinions.  Damant's written expert report states that "the fire was caused by the spontaneous combustion of the polyurethane foam insulation. ... The chemical reaction of the polyurethane chemicals creates an exothermic, or heat producing, reaction.  Unless the chemical reaction is properly controlled, and the spray applied polyurethane foam insulation is correctly applied, i.e. correct thickness, spontaneous combustion of urethane systems can occur."  (Doc. 56, at Exh. A, Exh. 3.)  At his deposition, Damant buttressed these opinions with the following supplemental opinions: (a) "that the fire was most probably caused as a result of the insulation being applied too thickly initially at the eave section of the Kerns home"; (b) "that the fire was probably caused in addition by a lack of adequate ventilation at that specific location"; and (c) alternatively, "that insufficient time was elapsed between the application of a second lift" of

_____

[13]        Defendants spend much of their opposition brief unhelpfully bolstering the admissibility of aspects of Creel's opinions that plaintiffs do not challenge.  For example, plaintiffs have not attacked Creel's opinion that defendants' application of the foam was in accordance with industry standards and can be ruled out as a cause of the fire, yet much of defendants' brief is devoted to explaining why those opinions pass muster in a Rule 702 analysis.  Defendants also use their brief to attempt to deflect attention from a *Daubert* analysis of Creel's testimony in favor of arguing that plaintiffs' expert's testimony flunks *Daubert* scrutiny.  Again, this is not helpful in resolving the specific legal challenges embodied in plaintiffs' Motion in Limine.  In an effort to preserve Creel's testimony on the core temperature issue from disqualification under *Daubert*, defendants assert that Creel's "opinion as to the cause of the fire was based on the testimony of [Sealy and Frank, the two people who applied the foam at the Kerns' house] and 'on the fact' that there were 'problems with the chemicals' in that time frame and on his experience as an applicator."  (Defendants' Brief (doc. 48), at 11.)  But this argument is not consistent with Creel's testimony that his opinion that there was a defective batch of chemicals is based solely on things he had heard about the industry in 2005, and that these things he had heard were all he could base that opinion on.  Moreover, much as defendants would like to attribute this causation opinion to Creel's body of experience in the foam insulation business, the Court has scoured the deposition transcript excerpts in vain for any testimony that Creel relied on that experience in formulating his opinion that a defective batch of foam with a core temperature problem caused the fire.

foam insulation at that location.  (Damant Dep., at 29-30.)

        *1.     Damant's Qualifications.*

Defendants maintain that Damant is not qualified to offer expert opinions concerning the application of spray-on polyurethane foam insulation.  In support of their position, defendants point to Damant's testimony that he has never personally applied or installed polyurethane foam to a building (*id.* at 61, 113), that he has never seen foam applied in attic applications "up close" and has not seen it done at any distance in "at least a dozen years or more" (*id.*), that he has never written an article about polyurethane foam insulation installation in a house or other structure (*id.* at 69-70), that he has never trained anyone to install polyurethane foam insulation (*id.* at 70), and that he has never before given testimony in a case involving polyurethane foam insulation (*id.* at 15, 112).  These facts are uncontested.

In response, plaintiffs cite Damant's 30 years of experience in working for the California Department of Consumer Affairs, Bureau of Home Furnishings and Thermal Insulation, as a textile chemist, as Head of Flammability Research, and as Chief of that Bureau, during which time he authored state flammability standards for consumer products and was "actively involved in flammability and fire research."  (Damant Dep., at Exh. 3.)  Damant has written hundreds of papers and technical publications concerning flammability of consumer products, such as upholstered furniture and mattresses.  (*Id.*)  He has served as an expert witness in "several hundred litigation cases involving the flammability of a variety of consumer products" in courts in more than 20 states.  (*Id.*)  He serves and has served as a member of various trade organizations, safety committees, fire research groups and the like, and has "lectured throughout the world on the flammability of consumer products."  (*Id.*)  He holds a bachelor's degree in chemistry, but has not worked in a laboratory as a full-time chemist in well over a decade.  (*Id.* at 78-79, 108.)

Damant's qualifications are divorced from the polyurethane foam insulation business; rather, his experience and expertise lies in the field of flammability of consumer products such as mattresses, bedding materials and furniture, not the application of spray-on insulation.  Damant appears eminently qualified to testify concerning the flammability of household products such as mattresses and sofas, and the regulatory standards attendant to those products.  But nothing in his extensive curriculum vitae would suggest that he has any expertise in the proper application of

spray-on foam insulation or the risk of fire during the application process.  Plaintiffs'
counterargument rests on the premise that foam is foam.  Certainly, mattresses and home
furnishings may have polyurethane foam components in them, the flammability of which lies in
the heartland of Damant's expertise.  Because Damant is an expert in the flammability of
consumer products that contain polyurethane foam, plaintiffs reason, he must also be an expert in
evaluating the risk of fire in the application of spray-on polyurethane foam insulation to an attic.
This contention is not logical and cannot be credited.  A metallurgist is not rendered an expert in
accident reconstruction simply because both drivers were behind the wheel of automobiles,
which are made of metal.  A beekeeper is not rendered an expert in the health and nutritional
effects of honey on small children simply because he breeds insects that produce honey.  A
recording studio engineer does not become an expert in the treatment and prevention of tinnitus
simply because his field of expertise involves sound waves, which also cause tinnitus.  *See
generally Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("merely
possessing a medical degree is not sufficient to permit a physician to testify concerning any
medical-related issue").

　　　　*Daubert* requires the proponent of expert testimony to show, *inter alia*, that "the expert is
qualified to testify competently regarding matters he intends to address."  *Corwin*, 475 F.3d at
1250 (citation omitted).[14]  Damant may be, and indeed by all appearances is, highly qualified to
offer expert opinions as to flame-retardation specifications and standards in the consumer
products field.  Had a bedding or drapery fire broken out in the Kernses' home, Damant would
be well-suited to testify as to the flammability of those blankets or curtains and their contribution
to the fire.  But his expertise in regulating, designing and assessing the flammability of finished
consumer products and furnishings in people's homes appears entirely distinct from, and
irrelevant to, the question of whether defendants applied polyurethane foam insulation in the

---

　　　　[14]　　　　*See also Levin*, 459 F.3d at 78 ("a testifying expert should have achieved a
meaningful threshold of expertise in the given area") (citation omitted); *Klaczak v. Consolidated
Medical Transport*, 458 F. Supp.2d 622, 665 (N.D. Ill. 2006) (observing that expert must possess
sufficient specialized expertise to render his opinion reliable, and that his competence in the
general field must extend to his specific testimony on the pending matter); *Pell*, 231 F.R.D. at
192 (expert must have specialized knowledge or training, and his opinion must be confined to his
field of expertise).

Kernses' attic in a manner that caused a fire.  Whether a mattress made with polyurethane foam poses an unreasonable risk of fire when it is placed in a consumer's home is an entirely separate issue from whether the mixing of chemicals by defendants to make polyurethane foam insulation at plaintiffs' house gave off an exothermic reaction of sufficient intensity to start a fire because that insulation was applied too thickly, with inadequate ventilation, or with insufficient time between lifts.  The latter question lies at the epicenter of this litigation.  Nothing in plaintiffs' evidentiary materials suggests that Damant has any knowledge or experience whatsoever in the proper application of polyurethane foam insulation.[15]  As such, plaintiffs have not met their burden of showing by a preponderance of the evidence that Damant is qualified to testify competently regarding the opinions expressed in his expert report and deposition.  "That a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields."  *Levin*, 459 F.3d at 78 (citing *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2nd Cir. 2005)).[16]  Plaintiffs having failed to show that Damant is qualified to testify competently regarding the matter he

---

[15]     In his deposition, Damant made two attempts to establish his expertise to offer his opinions.  First, he testified that he "regulated the polyurethane foam industry in California for many years."  (Damant Dep., at 42.)  But Damant does not suggest that he regulated the techniques for applying foam insulation, that he was involved in establishing protocols and procedures for proper application of spray-on foam insulation to minimize the risk of fire caused by exothermic reaction from the mixing of chemicals at the job site, or that he has any experience or expert knowledge of any kind as to these techniques and procedures.  Again, he is attempting to testify about oranges by establishing his expertise about tangerines.  Second, Damant referenced his "discussion with appliers of polyurethane foam -- spray-applied polyurethane foam" about the ways they apply that foam and the problems involved in that application process.  (*Id.* at 42-43.)  But simply having discussions with foam appliers regarding the challenges of their work no more makes him an expert on that subject than would a jury who listened to live testimony from foam appliers about the application process.  Besides, Damant acknowledges that these conversations with foam appliers occurred in the distant past, as they "would have been prior to 1993."  (*Id.* at 60.)

[16]     Nor does plaintiffs' failure to meet their evidentiary burden of establishing Damant's qualifications to offer the opinions presented in this case entitle them to an evidentiary hearing as a second opportunity to meet that burden.  *See, e.g., Cook*, 402 F.3d at 1114 (stressing that it is the proponent's burden, not that of the trial court, to lay the foundation for admission of expert testimony, and it is no abuse of discretion for the trial court not to hold a *Daubert* hearing when the proponent has failed to meet its burden).

intends to address, defendants' Motion to Strike is properly **granted**.

2.    *Foundation for Damant's Opinions.*

Even if Damant were qualified to offer the expert opinions plaintiffs proffer in this case, those opinions would still be inadmissible under Rule 702 because they lack the necessary indicia of reliability to be of assistance to the trier of fact.  Damant testified that there were "several potential -- potential causes for a runaway exothermic reaction. ... The other potential causes for a runaway exothermic reaction in polyurethane foam is an incorrect formulation with respect to the polyurethane foam.  That -- That's certainly a -- possible."  (Damant Dep., at 32.) Damant also looked at static electricity as a potential cause of the fire.  (*Id.* at 39.)  After considering these possibilities, he opined that the fire was caused by defendants' negligence, to-wit:  "insulation being applied too thickly at the eave section of the Kerns home," "a lack of adequate ventilation at that specific location," and/or "insufficient time ... between the application of a second lift," or layer, of foam.  (*Id.* at 29-30.)[17]  To assess the admissibility of this opinion, it is crucially important to examine Damant's methodology for eliminating the "incorrect formulation" explanation.

Damant testified that he "agree[s] that one of the possible or theoretical causes could have been a chemical defect in the batch of the foam's formula."  (*Id.* at 102.)  Nonetheless, he "discounted" that possibility, based not on any expert knowledge or experience, but instead based solely on defendant Sealy's testimony "that he had previously used this material on numerous other applications without any problems."  (*Id.*)  But that misrepresents Sealy's testimony.  In fact, Sealy's deposition says nothing about using this particular batch of chemicals prior to the Kerns job.  Although Sealy testified that plaintiffs' house was not the first job at which he had ever used this blowing agent (the so-called "B component"), Sealy apparently was not asked and did not testify when he received this particular batch of chemicals from his supplier and whether he had used that particular batch on any prior jobs.  (Sealy Dep., at 146.) Sealy also testified that he never used that batch of chemicals for any subsequent jobs of any kind following the Kerns fire.  (*Id.* at 246.)  Moreover, Sealy has submitted an affidavit

---

17      According to Damant, "[a] lift is how high you go per pass basically."  (*Id.* at 56.)

reflecting that neither he nor his company had ever used this batch of chemicals on any residential application prior to the Kerns job.  (Doc. 31, at Exh. 11 ¶ 3.)[18]  Damant has offered no evidence and no reason to believe that the chemical composition of the batch of chemicals used on plaintiffs' residence was identical to that used by defendants on previous residential applications; therefore, any suggestion by Damant that those chemical compositions were the same would be sheer speculation.  Thus, there is no evidence in the record, and the record specifically refutes, that defendants had previously used this batch of chemicals "on numerous other applications without any problems," which was the sole and entire basis for Damant's expert opinion rejecting the manufacturing defect theory of causation.  An expert opinion predicated exclusively on assumed facts that contradict the record is not reliable at all.

Even if Damant were qualified to offer opinions as to the cause of the fire, and even if his opinion rejecting the defective batch theory had some basis in fact, this opinion would remain inadmissible because it would not assist the trier of fact.  Simply put, Damant's elimination of the defective batch theory based solely on purported testimony that defendants had never had problems with that batch before is not in any way related to his expertise, as far as this Court can discern.  Instead, he is stepping into the shoes of the jury.  Damant is no more able to eliminate the defective batch theory based on alleged facts that defendants had used that batch before without trouble than a lay person would be.  Plaintiffs have not shown that Damant utilized his expertise in any way, shape or form in rendering his opinion that the fire was not caused by a defective batch.  The notion that the batch had never caused a fire before, so it could not have caused this fire, at least as postured here, is mere common-sense reasoning well within the ken of the average juror.  Plaintiffs have not shown that Damant's special expertise is in any way instructive, illuminative, or helpful in reaching that quite straightforward conclusion.[19]

---

[18]      In particular, Sealy averred as follows: "the two particular barrels of material combined to make the polyurethane foam spray that were used on the Kerns residence had not been used on any residential application previously or after it was applied at the Kerns residence."  (*Id.*)

[19]      The Court's conclusion would likely differ had Damant performed some testing, inspection or analysis of either the actual foam that caught fire in the Kernses' house, or the batch of chemicals that defendants used in spraying that house.  Those chemicals remain in

-17-

Damant's exclusion of the defective batch hypothesis is critically important to his ultimate opinion that the fire was caused by the improper application of the foam insulation by defendants. Indeed, plaintiffs stress that Damant used a process of elimination in determining the cause of the blaze. (Plaintiffs' Brief (doc. 56), at 5, 7-9.) Plaintiffs are of course correct that process of elimination has routinely been upheld as a viable, sound methodology for use by expert witnesses. But if, as here, Damant has exercised that process of elimination to cross off alternative causes based on facts that contradict the record and a simplistic reasoning methodology that is far removed from any expertise that he might have, then the results of that process (*i.e.*, that defendants caused the fire by applying the foam incorrectly) are necessarily suspect, not reliable, and not helpful to a jury.

For all of these reasons, the Court finds that plaintiffs' Motion to Strike Testimony of Plaintiffs' Expert Gordon Damant (doc. 50) is due to be, and the same hereby is, **granted**. Damant's expert opinions as to the cause of the fire are **excluded** from consideration on the Rule 56 Motion and the trial of this cause pursuant to Rule 702 and *Daubert* on the grounds that plaintiffs have failed to meet their burden of establishing by a preponderance of the evidence that Damant is qualified to testify competently concerning the matters he addresses, that his methodology is sufficiently reliable, and that his testimony will assist the trier of fact to understand the evidence or to determine the fact in issue.

## IV.   Defendants' Motion to Strike Declaration of Todd G. Posey.

Finally, defendants file a Motion in Limine and to Strike Exhibit H to Plaintiffs' Reply Brief (doc. 47). In this Motion, defendants invoke the "sham affidavit" doctrine with respect to the Declaration of Todd G. Posey submitted as Exhibit H to plaintiffs' opposition brief to the pending summary judgment motion. Defendants contend that Posey's Declaration directly contradicts his prior sworn testimony in this case and should therefore be stricken. In particular,

---

defendants' inventory today, and are readily available for testing. (Sealy Dep., at 246.) Instead of performing some analysis or testing of the foam that might enable him to offer an expert opinion as to whether a defective batch caused the fire, Damant simply said that this theory must not be correct because the batch had been used before without problems. This line of reasoning sounds like a lawyer's argument to a jury, not a theory for which expert testimony is necessary or helpful.

defendants take issue with Posey's statement in his declaration that he does "not preclude the possibility that spontaneous combustion caused this fire."  (Posey Decl., ¶ 6.)  According to defendants, this statement flatly contradicts his prior deposition testimony wherein he stated as follows:

> "Q:   I understand.  And would it be fair to say to this day, in your opinion, the cause of this fire is unknown?
> "A:    Yes, sir."

(Posey Dep., at 34.)

"Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003); *see also Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 284 (S.D. Ala. 2006) (explaining and applying "sham affidavit" rule).   The problem with defendants' reliance on that rule here, however, is that there is no discrepancy between Posey's Declaration and his deposition testimony on this point.  It is entirely consistent and harmonious for Posey to testify that he does not know the true cause of the fire but that spontaneous combustion is a possible cause.  There being no inconsistency, the "sham affidavit" rule is inapplicable.  *See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984) (explaining that a nonmovant may create a genuine issue of material fact by submitting affidavit clarifying testimony given in his deposition); *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) (observing that a nonmovant "may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits"); *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995) (stating that, even under the "sham affidavit" doctrine, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony"); *Stewart v. Board of Comm'rs for Shawnee County, Kansas*, 216 F. Supp.2d 1265, 1270 (D. Kan. 2002) (considering information in affidavits that served to clarify, explain or correct prior misstatements, as affidavits were not a "sham" with respect to such information).   Defendants' Motion in Limine and to Strike Exhibit H (doc. 47) seeks to condemn an inconsistency where

none exists; therefore, that Motion is properly **denied**.[20]

## V. Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1. Plaintiffs' Motion to Strike Paragraph 4 of Mark Sealy's Affidavit (doc. 40) is **granted in part**, and **denied in part**. The Motion is **granted** with respect to the second sentence of Paragraph 4 of the Mark Sealy Affidavit, which sentence is **stricken** as being in violation of the personal knowledge requirement of Rule 56(e) of the Federal Rules of Civil Procedure. In all other respects, the Motion to Strike is **denied**.

2. Plaintiffs' Motion in Limine to Preclude the Testimony of Larry Creel as Expert Witness (doc. 42) is **granted** with respect to Creel's opinions that the foam used by defendants on the Kerns residence had a manufacturing defect with respect to core temperature. Those opinions will be **excluded** pursuant to Rule 702 of the Federal Rules of Evidence as being unreliable and unhelpful to the finder of fact; provided, however, that nothing herein forbids or limits Creel from testifying as to any other opinions identified in his expert report or deposition transcript.

3. Defendants' Motion to Strike Testimony of Plaintiffs' Expert Gordon Damant (doc. 50) is **granted** and Damant's expert opinions will be **excluded** pursuant to Rule 702 on the grounds that plaintiffs have failed to satisfy their burden of showing that Damant is qualified to testify competently regarding the subject

---

[20] In a reply brief (doc. 59), defendants attempt to recast their Motion to Strike the Posey Declaration as being grounded on untimely disclosure of this "supplemental" opinion that spontaneous combustion is a possible cause of the fire. This argument appears nowhere in the Motion to Strike itself, and it is improper for a party to transform its evidentiary motion into a moving target by modifying the basis for seeking to exclude the challenged testimony in a reply brief after it is too late for opposing counsel to be heard on the new ground. *See generally Fisher*, 238 F.R.D. at 317 n.89 ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *Sweet v. Pfizer*, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("the moving party in a motion cannot submit new information as part of its Reply"); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not raise new arguments in a reply brief").

matter of his opinions here, or that Damant's opinions contain the necessary indicia of reliability to be of assistance to the trier of fact.

4.      Defendants' Motion in Limine and to Strike Exhibit H to Plaintiffs' Reply Brief (doc. 47) is **denied** because there is no inconsistency between the Posey Declaration and his earlier deposition testimony concerning the cause of the fire, such that the sham affidavit rule is inapplicable.

DONE and ORDERED this 6th day of July, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE