**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MELVIN KERNS,** *et al.*,         ) | |
|           ) | |
|     **Plaintiffs,**       ) | |
|           ) | |
| **v.**                    ) | **CIVIL ACTION 06-0431-WS-B** |
|           ) | |
| **MARK SEALY, d/b/a PRO-FOAM OF**  ) | |
|  **SOUTH ALABAMA, INC.,** *et al.*,  ) | |
|           ) | |
|     **Defendants.**     ) | |

**ORDER**

This matter comes before the Court on the Motion for Summary Judgment (doc. 31) filed by defendants Mark Sealy and Pro-Foam of South Alabama, Inc. The Motion has been briefed and is ripe for disposition.[1]

**I.      Background.[2]**

---

[1]      The Court's review of the Motion has been hampered by movants' failure to comply with Section 13.c. of the Rule 16(b) Scheduling Order (doc. 12), which provides in bold text as follows: "If a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery." (Doc. 12, at 4.) Plaintiffs complied with this requirement with respect to their opposition brief; however, defendants did not, even though they submitted more than 200 pages of exhibits with their two briefs on the Rule 56 issues. Defendants' noncompliance renders it more difficult and time-consuming for the Court to examine defendants' evidentiary submission than to examine that of the plaintiffs.

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party, resolving all reasonable doubts about the facts in favor of the non-movant. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor. Additionally, the recitation of facts is shaped in part by the Order (doc. 62) entered on July 6, 2007, wherein the undersigned resolved various evidentiary disputes. Pursuant to the July 6 Order, certain evidence (including defendant Sealy's hearsay speculation about whether the manufacturer had experienced a core temperature problem with this particular formulation of the product, defense expert Larry Creel's opinions that this foam had a manufacturing defect that caused it to have a core temperature problem, and

### A.    *The Nature of this Action.*

This action arises from a fire on November 8, 2005 that caused substantial damage to a partially constructed house in Gulf Shores, Alabama, belonging to plaintiffs, Melvin and Pauline Kerns.  Plaintiffs maintain that defendants Mark Sealy and Pro-Foam of South Alabama, Inc. caused the fire while applying spray-on foam insulation in the attic of that house.  Pursuant to that contention, plaintiffs filed a Complaint (doc. 1) against defendants in federal court, setting forth exclusively state-law causes of action for negligence, wantonness, breach of contract and *res ipsa loquitur.*[3]

### B.    *The Fire.*

Viewed in the light most favorable to plaintiffs, the record facts are as follows: The Kernses are residents of Atlanta, Georgia who are in their mid-60s and who intend to retire to southern Alabama.  (P. Kerns Dep., at 25, 27, 47.)  To achieve that goal, plaintiffs were building a nearly 4,000 square-foot home at 43 Bayside Court in Gulf Shores, Alabama, with Mrs. Kerns serving as general contractor for the project.  (*Id.* at 56-57, 70.)  In approximately September 2005, plaintiffs contacted defendant Pro-Foam of South Alabama, Inc. ("Pro-Foam") to request an estimate for application of spray-on polyurethane foam insulation in the attic of the Gulf Shores house.  (Sealy Dep., at 127.)  On or about September 25, 2005, defendant Paul Mark Sealy, owner of Pro-Foam, came to the home site to meet with the Kernses, examine the house, and provide an estimate.  (M. Kerns Dep., at 14-15; Sealy Dep., at 129-30.)  That day, Sealy gave plaintiffs a written estimate on Pro-Foam letterhead quoting a total price of $10,926.00 for application of polyurethane foam insulation over the entirety of the 3,900 square foot roof deck,

_____

plaintiffs' expert Gordon Damant's entire testimony and opinions) will not be considered herein, and certain other evidence (such as Sealy's testimony about the source of the foam applied at plaintiffs' house, and plaintiffs' expert Todd Posey's testimony that the fire could have been caused by spontaneous combustion) will be allowed and considered over a party's objection.

[3]    Federal subject matter jurisdiction was properly predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332, inasmuch as plaintiffs (despite building a residence in Gulf Shores, Alabama) are citizens of Georgia, or at least they were at the time they filed the Complaint, and defendants are both of Alabama citizenship for diversity purposes.  The amount in controversy greatly eclipses $75,000, as the Kernses are seeking recovery in excess of $200,000 for out-of-pocket repair expenses, mental anguish, and other alleged damages.

plus nearly 500 square feet of vertical surfaces and 444 square feet over the rear porch.  (Sealy Dep., at 131 &  Exh. 5.)  A short time later, Mrs. Kerns contacted Sealy and advised him that plaintiffs wanted Pro-Foam to proceed.  (*Id.* at 142.)

Prior to November 8, 2005, Sealy and another Pro-Foam representative, non-party John Frank, went to plaintiffs' house (construction of which was only halfway complete at that time) to apply the foam.[4]  Although Pro-Foam was a side business for them, Sealy and Frank were experienced in this kind of work, having done literally "hundreds of jobs" prior to this one.  (Sealy Dep., at 217.)  The parties agree that this kind of insulation is applied by mixing two chemicals, an "A" component and a "B" component, through a spray gun.  The mixing of the chemicals causes an exothermic chemical reaction, producing both heat and foam, which rises like shaving cream after being expelled from the gun.  Sealy and Frank were unable to complete the application that day because they encountered a temperature problem with the raw material, in that the B component was too cold -- and therefore too thick to be pumped out of the drum effectively -- because of chilly weather, resulting in poor foam.  (Sealy Dep., at 145-48.)  Upon observing this problem, Sealy and Frank ceased work on the plaintiffs' job after proceeding "[n]ot far," and contacted their distributor to troubleshoot the matter.  (*Id.* at 149-50.)  Based on this consultation, Sealy and Frank determined that the problem could be corrected by maintaining the chemicals in an insulated space.  For that reason, they sprayed a thin layer of foam insulation on the walls of the trailer in which they stored drums of foam chemicals so that the interior of that trailer (and, hence, the chemicals) would stay warm overnight.  (*Id.* at 150-52.)  Sealy and Frank used the same batch of chemicals to spray the trailer walls that they used on plaintiffs' house.

Defendant Sealy's testimony concerning events on the day of the fire is largely undisputed.  On the morning of November 8, 2005, Sealy and Frank returned to the Kernses'

---

[4]        Pro-Foam had purchased this particular batch of foam chemicals several weeks earlier from an unrelated company called Profoam Distribution, which is not a party to these proceedings.  (Sealy Dep. at 141; Sealy Aff., ¶ 4.)  Profoam Distribution purchased this batch of foam from the manufacturer, nonparty Isotec International, Inc.  (Frank Dep., at 71; Sealy Aff., ¶ 4.)  Defendants had never used these particular barrels of chemicals on any other residential application prior to or after the Kerns job, although they did use them to apply a thin coating of foam inside Pro-South's trailer to insulate the barrels from cold weather.  (Sealy Aff., ¶ 3.)

house to perform the foam insulation job. (*Id.* at 157.)  No one else was present at the construction site that day.  (Frank Dep. at 51.)  Defendants anticipated being able to complete the entire job in a single eight-hour day, spraying two two-inch layers, or "lifts," of foam over the entire roof deck of the house.  (Sealy Dep., at 159-60.)  In general, defendants' procedure was to spray a two-inch lift for 30 to 40 minutes, then go back to the beginning and spray a second two-inch lift directly over the same area that had been previously sprayed, for a total tepth of 4 inches.  (*Id.* at 160.)  According to defendants' expert, "[i]ndustry standards recommend that you not put foam on any thicker than two inches in one pass" for safety purposes.  (Creel Dep., at 49.)  Defendants subscribed to that general rule.  (Sealy Dep., at 86, 88.)  Their protocol for applying foam was to have one person actually spraying in the attic, while the other one monitored the chemical drums and kept an eye on the person doing the spraying, with the two individuals swapping responsibilities every 45 minutes to an hour so that the person doing the spraying would not get too tired.  (*Id.* at 158.)

Defendants do not recall whether they used lighting or fans on the jobsite, although they had used them on other jobs and were working in an unventilated attic with poor visibility in places.  (Sealy Dep., at 173, 175-76, 185; Frank Dep., at 62.)  Sealy testified that he could not see into an eve area at the corner of the roof where they applied foam (and where the fire appears to have ignited).  (Sealy Dep., at 197-98.)  Moreover, there is no evidence in the record as to what, if any, steps Sealy and Frank took to ensure that each lift did not exceed two inches.  In that regard, defendants' expert Larry Creel testified that applying these two-inch lifts is not an exact science and that there may be areas where more than two inches of foam are inadvertently applied in a given lift by the applicator.  (Creel Dep., at 50-51.)  As evidence that this actually happened here, plaintiffs point to post-fire photographs that, while difficult to interpret, might reasonably be construed as depicting unburned foam in the roof area at depths exceeding 4 inches in places.  (Plaintiffs' Exh. K.)[5]

---

[5]     The Court understands that Creel interprets certain photographs as reflecting that the unburned foam in the Kernses' attic does not exceed 4 inches in depth.  (Creel Dep., at 62.)  Thus, there may a genuine factual dispute as to the proper interpretation of those photographs.  Furthermore, defendants filed a Motion to Strike Plaintiffs' Supplemental Evidentiary Filing (doc. 69) on July 10, 2007, seeking to strike Plaintiffs' Exhibit K and the slightly over one page

At some point before noon, Sealy left the premises for a lunch break, while Frank remained on site and continued applying foam.  (*Id.* at 164.)  When Sealy returned, he and Frank noticed a "light haze" that they had never observed previously in their hundreds of foam insulation jobs.  (*Id.* at 161-64.)  This haze was light in color, not a dark smoke.  (Frank Dep., at 63.)  Sealy also could detect a burning odor.  (Sealy Dep., at 162.)  Upon noticing the haze, they stopped spraying, but the haze "started getting more and more and more and more."  (*Id.* at 161-64.)[6]  Sealy and Frank isolated the region of the house which was smoldering, an area where they already had applied two two-inch lifts of foam.  (*Id.* at 166-68; Frank Dep., at 82-83.)  They attempted to remove the smoldering foam material by hand, even going outside and pulling down the eve to separate it from other combustible materials in the area.  (Sealy Dep., at 166-68.)  Industry standards dictate that when "you have a hot spot or foam that you know is hot, then you need to take measures to correct it, which generally means opening up that hot spot to

_____

memorandum that accompanied it on the grounds that the filing was untimely, raising something new for the Court's consideration after it was too late for defendants to respond.  The Court agrees that plaintiffs' filing amounts to an unauthorized sur-reply that should only have been submitted with prior leave.  Nonetheless, the Court, in its discretion, will consider this filing.  Inasmuch as Plaintiffs' Supplemental Evidentiary Filing largely reiterates ground that the parties have already covered in detail in their voluminous other recent filings in this case (as defendants themselves concede) and as defendants essentially set forth their substantive reply to the sur-reply in their Motion to Strike, no conceivable prejudice can be visited upon defendants from the timing of plaintiffs' submission.  As for defendants' contention that plaintiffs' supplemental filing misrepresents the evidence, a party's disagreement with the arguments presented in a filing is not a valid basis for the extraordinary remedy of striking that filing altogether.  *See generally English v. CSA Equipment Co.*, 2006 WL 2456030, *2 (S.D. Ala. Aug. 22, 2006) (explaining circumstances under which striking a submission may be appropriate, and declaring that a brief should not be stricken simply because its arguments are incorrect, misguided or unpersuasive).  The Motion to Strike (doc. 69) is **denied**.  With respect to defendants' contention that plaintiffs misinterpret the evidence, the Court considers the evidence in the light most favorable to the Kernses on summary judgment, and construes all reasonable inferences from the facts in their favor.  This same approach has been taken with regard to plaintiffs' supplemental filing, notwithstanding defendants' disagreement with the factual recitation in that filing.

[6]       Plaintiffs argue that Sealy's testimony establishes that they did not stop spraying when they first saw the haze.  That misstates the record.  In fact, when plaintiffs' counsel suggested to Sealy that perhaps they had continued applying insulation when they saw the haze, Sealy responded, "No.  Once we saw the haze, you stop spraying."  (Sealy Dep., at 163.)

vent the heat out so that you don't have a fire." (Creel Dep., at 66.) Approximately 20 to 30 minutes after they first noticed the haze, Sealy and Frank saw flames. (Sealy Dep., at 165.)[7] The fire started in the southeast corner of the roof, in the eve area where they had previously applied foam. (*Id.* at 169, 173; Frank Dep., at 41-42.) As Sealy and Frank were both off-duty, trained, experienced, professional firefighters who did Pro-Foam work in their spare time, they attempted to douse the blaze themselves using a garden hose. (Sealy Dep., at 174-76.)[8] It is undisputed that they "tried [their] dangedest to put that fire out" (*id.* at 203) at risk to their own safety; unfortunately, their efforts were unsuccessful. At some point after the flames broke out, Sealy called 9-1-1 while Frank stayed in the attic with the hose, and the Gulf Shores Fire Department was summoned to the scene. (*Id.* at 176, 202, 205.) The Fire Department report reflects that firefighters were dispatched at 12:20 p.m., that they arrived on the scene at 12:28 p.m., and that they had the fire under control at 12:52 p.m. (*Id.* at Exh. 7.)

At no time did Pro-Foam representatives return to the Kernses' house to complete the job. Plaintiffs never invited them back to do the work. (Sealy Aff., ¶ 6.) Defendants never sent plaintiffs an invoice for the job, and the Kernses never paid Pro-Foam or Sealy any funds for the insulation work that had been done antecedent to the fire. (Sealy Dep., at 261-62.) Prior to this lawsuit, there were apparently never any discussions between the parties about Pro-Foam returning to plaintiffs' house to complete the foam insulation job.

### C.    *Cause(s) of the Fire.*

The Gulf Shores Fire Department performed an investigation of the fire in an attempt to determine its cause. Fire investigators could not find any source of ignition in the roof area where the fire began. (Blakemore Decl., at Exhibit.) Indeed, Sealy and Frank do not smoke, no electricity had been connected in the house, and there were no lightning strikes in the area, such that there were no conventional ignition sources on site. (*Id.*) Indeed, the only materials present were normal construction materials and the freshly-sprayed foam insulation. (*Id.*) On that basis, George T. Blakemore, Fire Chief for the City of Gulf Shores, informed plaintiffs as follows:

---

[7]    The insulation job was only 20 to 30 percent complete at that time. (*Id.* at 160.)

[8]    The record reflects that Sealy and Frank both inhaled toxic smoke in fighting the fire themselves, and that they "hacked up black stuff for a week" thereafter. (*Id.* at 202.)

"The only thing we can conclude as a source of ignition is a **possible** spontaneous ignition.  We were not able to locate any normal source of ignition at the point of origin."  (*Id.*)  The fire was also investigated by Todd Posey, a fire marshal for the City of Orange Beach, Alabama who was retained by plaintiffs.  Much like Blakemore, Posey opined that "[a]ll possible ignition sources on the scene at the time of the inspection were ruled out for the cause of the fire. ... The cause of the fire is unknown due to the lack of physical evidence."  (Posey Report, at 3; Posey Decl., ¶ 5.)  Posey likewise concurred with Blakemore that there is at least a "possibility that spontaneous combustion caused this fire."  (Posey Decl., ¶ 6.)

Although no definitive cause of the fire has been determined, several theories have been posited by witnesses in this case.  As mentioned *supra*, both Blakemore and Posey recognize the possibility of spontaneous combustion of the foam (which could occur if the foam were applied in a manner not in compliance with industry standards, such as in lifts that were too thick or that were repeated in accelerated time intervals, thereby trapping the heat generated by the exothermic reaction or otherwise preventing it from dissipating).  Defense expert Creel reiterated this possibility, observing that "[a]ll polyurethane foam if it's installed improperly is flammable" because of the exothermic reaction when the chemicals are combined.  (Creel Dep., at 28.)[9]  For example, according to Creel, if polyurethane foam is applied too thickly, "it will char.  You will notice a discoloration.  Occasionally, it will burn."  (*Id.* at 29.)  Nonetheless, Creel mentioned as other possible causes static electricity, an ignition source on the eve (such as a lit, smoldering cigarette or cigar), or a chemical defect in this batch of foam's formula that caused it to overheat.  (Creel Aff., at Exh., p. 2.)[10]  Sealy identified a similar list of possibilities during his deposition in

---

[9]     Elsewhere in his deposition, Creel stressed "that polyurethane foam was a burnable plastic and every chemical manufacturer sells it as a burnable plastic."  (*Id.* at 96.)

[10]     As mentioned in the July 6 Order, Creel performed no testing or physical inspection of the actual foam used in the Kernses' house in order to differentiate between these possible explanations.  (Creel Dep., at 87.)  When asked about this, Creel testified, "I would have loved to have seen a sample."  (*Id.* at 56.)  Nonetheless, defendants elected not to allow Creel to inspect a sample of the foam, even though some foam remained at the house after the fire and even though defendants retain possession of the exact drums of batch chemicals used in applying foam at plaintiffs' house.  (Sealy Dep., at 246.)  Similarly, plaintiffs never retained an expert to test or inspect the actual foam used in this case for evidence of a manufacturing defect.  One can

response to queries by plaintiffs' counsel.  (Sealy Dep., at 196.)  Neither side has proffered any admissible, reliable expert opinions as to which of these potential explanations actually caused the fire; however, Creel has opined (and will be allowed to testify at trial) that, based on the testimony of Sealy and Frank as to what they did on November 8, 2005, foam application may be ruled out as a cause of the fire because they applied the foam in a manner consistent with industry standards.  (Creel Aff., at Exh., p. 2; Creel Dep., at 54-55, 71-72.)

> ### D.      *Claimed Damages.*

The home was approximately 50% complete at the time of the fire.  (P. Kerns Dep., at 87-88, 183.)  Plaintiffs' evidence is that the fire caused extensive damage.  For example, all of the sheetrock that had been delivered had to be discarded because of smoke damage and mildew. (P. Kerns Dep., at 59.)  Demolition and removal of the damaged areas of the structure began shortly before Christmas 2005.  (*Id.* at 97.)  The home was finally substantially completed in approximately November or December 2006, more than a year after the fire.  (*Id.* at 55.) Plaintiffs' evidence is that it took six months to restore the house to its condition preceding the fire.  (*Id.* at 82.)

Mrs. Kerns testified that the fire prevented plaintiffs from retiring and moving to south Alabama in the time frame they had anticipated.  (P. Kerns Dep., at 27.)  In particular, she indicated that plaintiffs have had to continue to working in order to replenish the $150,000 they withdrew from their retirement accounts to repair the fire damage.  (*Id.* at 28.)  Mr. Kerns reinforced his wife's testimony by stating that he had worked a year longer than he had intended in order to replace funds expended to repair the fire damage "just to make sure that we have adequate funds to live on."  (M. Kerns Dep., at 31-32.)[11]  Mrs. Kerns also testified that she sustained $10,000 in lost wages on account of the fire because she "couldn't call on [her]

---

only guess how differently this litigation might have evolved had either side performed testing of the subject chemicals and foam for the presence of a manufacturing defect.

[11]      That said, Mr. Kerns also testified that he did not believe his wife was planning to retire, and that she could continue running her marble and tile business from Gulf Shores just as easily as she could from Atlanta or anywhere else.  (M. Kerns Dep., at 34.)  For his part, however, Mr. Kerns articulated an intention to retire from his civil service job for the Department of the Army effective January 2008.  (*Id.*)

designers and architects as frequently" for her marble and tile business.  (P. Kerns Dep., at 97.)
This $10,000 figure lacks mathematical precision and is an "estimate," by Mrs. Kerns's own
reckoning.  (*Id.* at 98.)

More generally, plaintiffs have submitted a three-page spreadsheet summarizing their
damages claims.  This document (and the accompanying declaration from Mrs. Kerns) identifies
line items totaling $188,899 in building supplies, waste removal, repairs, rental apartment fees
($5,423), and mileage ($8,125).[12]  (Plaintiffs' Exh. I.)  Additionally, plaintiffs claim $19,610 for
roof materials, $10,000 for estimated lost wages, $660 for furniture storage, and $2,060 for other
construction-related expenses, for a total of $221,229 in damages.  (*Id.*)  On top of these direct
monetary damages, plaintiffs seek unspecified amounts for mental anguish.  (*Id.*)

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact
and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
party seeking summary judgment bears "the initial burden to show the district court, by reference
to materials on file, that there are no genuine issues of material fact that should be decided at
trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party
has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of
a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing
on an essential element of her case with respect to which she has the burden of proof,' the
moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S.
317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden,
the court must stop short of weighing the evidence and making credibility determinations of the

---

[12]    Mrs. Kerns testified that plaintiffs claim as damages the mileage for 24 round-trip
drives from Atlanta to Gulf Shores, at a rate of 69 cents per mile, for a total amount of $10,764.
(P. Kerns Dep., at 79-80.)  Plaintiffs maintain that they made those 24 trips during the six-month
period following the fire, and that "it took us six months to arrive back at the state that we were
in prior to the fire."  (*Id.* at 82.)  Mrs. Kerns testified that those trips were necessary because she
"was overseeing everything" with regard to the repairs and reconstruction.  (*Id.* at 83.)  Although
the 69 cents figure is problematic because it "came from [her] head" (*Id.* at 81.), the damages
spreadsheet confirms that plaintiffs seek reimbursement for those trips at the lower rate of 48.5
cents per mile.  (Plaintiffs' Exh. I, at 2.)

truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not necessarily compel denial of a motion for summary judgment; rather, only material factual disputes preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

**III.    Analysis.**

    **A.    *Negligence / *Res Ipsa Loquitur *Claims.***

As an initial matter, defendants seek summary judgment on plaintiffs' negligence and *res ipsa loquitur* claims.  Defendants bear a heavy burden; after all, Alabama courts recognize that "summary judgment is rarely appropriate in negligence actions, which almost always present factual issues of causation and of the standard of care that should have been exercised." *Ex parte Mobile Power and Light Co.*, 810 So.2d 756, 759 (Ala. 2001) (citation omitted).  Further, Alabama courts have explained "that direct evidence is not necessary to prove negligence on the part of a defendant and that proof of negligence may be established completely through circumstantial evidence." *Id.* (citation omitted).  "A fact is established by circumstantial evidence if it can be reasonably inferred from the facts and circumstances adduced." *Bell v. Colony Apartments Co.*, 568 So.2d 805, 810-11 (Ala. 1990).

To prevail on a claim of negligence under Alabama law, a plaintiff must prove: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So.2d 564, 567 (Ala. 1994); *see also Zanaty Realty, Inc. v. Williams*, 935 So.2d 1163, 1167 (Ala. 2005) ("in order to prove a claim of negligence a plaintiff must establish that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff") (citation omitted).  In their Motion for Summary Judgment, defendants argue that the second and third elements are not satisfied.  Specifically, defendants maintain that there is no evidence that Sealy and Frank acted in a negligent manner on November 8, 2005; to the contrary, defendants contend, defense expert Creel has opined that their conduct comported with industry standards.  Even if defendants breached some duty of care, they assert, there is no evidence that such breach caused the fire, particularly where both plaintiffs' expert Posey and the Gulf Shores Fire Department have

opined that the cause of the fire is unknown and where all witnesses apparently agree that there are multiple possible causes, some of which (*e.g.*, manufacturing defect in the foam, foreign object/ignition source left concealed in the eve by an unknown third party) would not be attributable to defendants.

The parties' briefs devote considerable attention to debating the proper application of Alabama's doctrine of *res ipsa loquitur* to these circumstances.[13]  As explained by the Alabama Supreme Court, this doctrine "allows one, under certain circumstances, to infer negligence from the surrounding facts, in instances where the precise and exact cause of an injury is unknown or unknowable." *Khirieh v. State Farm Mut. Auto. Ins. Co.*, 594 So.2d 1220, 1223 (Ala. 1992). The elements of *res ipsa loquitur* are as follows: "(1) [T]he defendant must have had full management and control of the instrumentality which caused the injury; (2) the circumstances must be such that according to common knowledge and the experience of mankind the accident could not have happened if those having control of the management had not been negligent; (3) the plaintiff's injury must have resulted from the accident." *Mobile Power*, 810 So.2d at 759 (citation omitted).

This is not a *res ipsa loquitur* case.  The second element poses an insuperable obstacle for plaintiffs here because it is undisputed that there are a number of different potential causes of the fire at the Kernses' house that are extrinsic to defendants, including for example a manufacturing defect in the foam.  The foam applied on plaintiffs' house was manufactured by a third party, Isotec.  If Isotec manufactured that foam with a core temperature problem that

---

[13]     Plaintiffs have attempted to plead *res ipsa loquitur* as a distinct cause of action in Count IV, separate and apart from the generic negligence claim pleaded as Count I.  That is not a proper formulation of claims because *res ipsa loquitur* is not a separate tort or cause of action; rather, that doctrine is merely a procedural device that creates a rebuttable inference of negligence.  *See Alabama Great Southern R. Co. v. Johnson*, 71 So. 620, 621-22 (Ala. App. 1916) ("The doctrine of '*res ipsa loquitur*' involves no substantive rule of law; it merely means that the attendant facts or of such probative force on the question of inferential negligence as to speak for themselves."); *see also Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1328 (11th Cir. 1982) (doctrine of *res ipsa loquitur* "may be used only to prove negligence" under Alabama law); *DeBardeleben v. Tynes*, 276 So.2d 126, 129 (Ala. 1973) ("The rationale and result of the doctrine of *res ipsa loquitur* is to raise a rebuttable presumption" of negligence).  Thus, Count IV is simply a negligence claim, and is therefore due to be **dismissed** as redundant of the negligence claim set forth in Count I.

rendered it susceptible to overheating, then the fire could have occurred even if Sealy and Pro-Foam were not negligent at all.  That very real, very plausible alternative explanation -- which plaintiffs have proffered no competent evidence to disprove -- precludes the *res ipsa loquitur* inference here.  After all, "[i]f one can reasonably conclude that the accident could have happened without any negligence on the part of the defendant[], then the *res ipsa loquitur* presumption does not apply."  *Kmart Corp. v. Bassett*, 769 So.2d 282, 286 (Ala. 2000) (citation omitted) (trial court erred in denying defendant's motion for judgment as a matter of law on *res ipsa loquitur* theory in case involving malfunctioning automatic door, where malfunction could have occurred because the door was defective, not because defendant had negligently maintained it, such that doctrine of *res ipsa loquitur* does not apply); *see also Ex parte Crabtree Indus. Waste, Inc.*, 728 So.2d 155, 158 (Ala. 1998) (defendants were entitled to summary judgment, notwithstanding plaintiff's *res ipsa loquitur* argument, because one could reasonably conclude that wheel had broken loose as a result of materials failure or third-party negligence, rather than defendant's negligent inspection of wheel).[14]  From the summary judgment record, one could reasonably conclude that the fire at the Kernses' home could have happened even if Sealy and Pro-Foam were not negligent because, for example, the batch of foam might have had a core temperature problem; therefore, the presumption of *res ipsa loquitur* is plainly inapplicable.[15]

---

[14]     Plaintiffs argue that *Crabtree* is distinguishable because in that case, "there was evidence of a wheel repair just three days before the accident that could have been negligently performed."  (Plaintiffs' Brief, at 20.)  This is a false distinction, because this case involves evidence that the batch of foam sprayed at the Kernses' house was manufactured by a company called Isotec, which could have negligently manufactured it.  The *Crabtree* court did not cite to any evidence that the repair had been performed in a negligent manner; therefore, to the extent plaintiffs here argue that there is no evidence of negligent manufacture by Isotec, that omission in no way distinguishes this case from *Crabtree*.  The point is that in this case, as in *Crabtree*, there are alternative possible causes pursuant to which one could reasonably conclude that the accident could have happened even if defendants were not negligent at all.  In this case, as in *Crabtree*, "the plaintiff failed to present substantial evidence to foreclose such possibilities as these," rendering *res ipsa loquitur* inapplicable.  *Crabtree*, 728 So.2d at 158.  Thus, this case is directly analogous to *Crabtree*, notwithstanding plaintiffs' attempt to distinguish it.

[15]     Plaintiffs maintain that they are entitled to present their *res ipsa loquitur* theory to a jury as long as "a reasonable juror could conclude that the fire could not have happened if those having control of the management had not been negligent."  (Plaintiffs' Brief, at 17

As the *res ipsa loquitur* doctrine is not properly a part of this case, plaintiffs must show breach of duty by defendants through the ordinary means, by adducing sufficient evidence from which a reasonable factfinder could conclude that defendants were in fact negligent. Construed in the light most favorable to plaintiffs, the record reveals the following evidence of negligence: (a) defendants' expert testified that improper application of polyurethane foam insulation can start a fire because of the exothermic reaction when the chemicals are mixed; (b) industry safety standards call for polyurethane foam insulation to be applied in no more than two inches per pass, and a thicker foam application heightens the likelihood of a runaway exothermic reaction; (c) defendants applied the foam at the Kernses' home in two passes, so the total thickness of the foam should not exceed four inches to comply with industry safety standards; (d) there are post-fire photographs from which a reasonable factfinder could conclude that the thickness of the unburned foam exceeded four inches in depth, suggesting that defendants might have applied the foam in a manner that exceeded the industry safety standard of two inches per pass; (e) Sealy and Frank applied foam into or near an eave area where they could not see, such that it is unclear how they could know the thickness of each pass as they worked in that area; (f) the fire originated in that eave area; (g) although fans may be helpful in dissipating excess heat from the foam's exothermic reaction and lights may aid visibility, defendants do not recall using either on the Kernses' job; (h) although their standard protocol was for one person to spray foam while the other person monitored the area, Frank continued spraying in the Kernses' attic while Sealy went on a lunch break across the street; (i) Sealy noticed the haze and smelled the burning odor that were symptoms of a runaway exothermic reaction immediately after returning from his lunch

---

(emphasis omitted).)  But how could a reasonable juror conclude from this record that the fire could not possibly have been caused by a manufacturing defect or a foreign object in the eve? Plaintiffs have presented no competent evidence foreclosing those alternatives.  A reasonable juror could very well find from a preponderance of the evidence that defendants negligently caused the fire, but she could not conclude on this record that these alternative explanations could not possibly have caused the fire, as would be necessary for *res ipsa loquitur* to attach.  In *Crabtree*, for instance, the Alabama Supreme Court held that *res ipsa loquitur* was inapplicable and the defendants were entitled to summary judgment where, as here, there were several possible causes of the accident that the plaintiff had not foreclosed, such that a factfinder could reasonably conclude that the accident occurred without any negligence by the defendants.  The same result attaches here, and no *res ipsa loquitur* presumption can be invoked.

break; (j) defendants had never seen this kind of haze before in their hundreds of jobs; (k) industry standard for treating hotspots calls for foam appliers to cut them open to vent excess heat; (l) instead of cutting open hotspots, defendants resorted to scooping up foam with their hands and pulling down eaves; (m) no fire erupted for 20 or 30 minutes after defendants noticed the haze; (n) the haze grew worse and worse during that time period, yet defendants failed to call for help, failed to vent hotspots effectively, and otherwise failed to alleviate the problem; and (o) defendants failed to call for help at that time to prevent the fire even though they were both off-duty firefighters who were keenly aware of the fire hazards attendant to the foam insulation application process.

Viewing these facts in their totality, a reasonable finder of fact could determine that defendants breached a duty of care to defendants by failing to utilize adequate safety equipment at the jobsite, exceeding the industry standard of two inches per pass in applying foam, applying foam in or near an area where defendants could not see, continuing to apply foam while one member of the team was off the premises at lunch, and failing to take adequate measures to prevent the fire or call for help during the 20 to 30 minute interval after they first noticed the haze and smelled the burning odor that signaled a runaway exothermic reaction. A reasonable factfinder could further conclude that this breach of duty proximately caused the fire that resulted in heavy damage to plaintiffs' house. Accordingly, defendants are not entitled to summary judgment on the negligence cause of action set forth in Count I of the Amended Complaint.[16]

---

[16]    In so concluding, the undersigned is cognizant of Alabama caselaw holding that where the evidence shows multiple, equally plausible causes of harm, a plaintiff cannot reach a jury via mere speculation that one or the other of those causes was the actual cause. Indeed, Alabama courts have declared that "[p]roof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause. ... There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only." *Mobile Power*, 810 So.2d at 760 (citation omitted); *see also Bell*, 568 So.2d at 810 n.6 (same). Here, there are multiple plausible explanations for the fire, including application error and manufacturing defect. The Court's finding for summary judgment purposes, however, is that plaintiffs have adduced sufficient record facts pointing to an application error explanation to indicate a logical sequence of cause and effect, and to provide a

**B.    Wantonness Claim.**

Plaintiffs also bring a cause of action for wantonness, arguing that defendants willfully, wantonly and/or recklessly breached their duty of care.  (Amended Complaint, at Count II.) Under Alabama law, "[n]egligence and wantonness are two distinct tort concepts of actionable culpability; consequently, they are defined by differing elements." *S.B. v. Saint James School*, --- So.2d ----, 2006 WL 3530651, *24 n.7 (Ala. Dec. 8, 2006).  "Wantonness involves the conscious doing of some act or the omission of some duty, while ***knowing*** of the existing conditions and ***being conscious*** that, from doing or omitting to do an act, injury will likely or probably result." *Hooper v. Columbus Regional Healthcare System, Inc.*, 956 So.2d 1135, 1140 (Ala. 2006) (citation omitted).  "The knowledge of the defendant is the *sine qua non* of wantonness." *Norris v. City of Montgomery*, 821 So.2d 149, 156 n.9 (Ala. 2001) (citations omitted).  Simply put, "while ordinary negligence involves inadvertence, wantonness requires a showing of a conscious or an intentional act," which may be proven "by showing circumstances from which the fact of knowledge is a reasonable inference." *Hicks v. Dunn*, 819 So.2d 22, 24 (Ala. 2001) (citations omitted).

Defendants bristle that plaintiffs even allege wantonness in this case, given the absence of evidence of deliberate wrongdoing.  (Defendants' Brief (doc. 32), at 14.)  No one has argued, and there is certainly no evidence, that Sealy and Frank intentionally burned down the Kernses' house.  However, an Alabama wantonness claim does not require proof that a defendant harbored a specific design or intent to cause harm.  *See, e.g., Clark v. Kindley*, --- So.2d ----, 2007 WL 431018, *3 (Ala.Civ.App. Feb. 9, 2007) (citation omitted).  The summary judgment record contains substantial evidence that defendants had actual knowledge of the risk of fire attendant to spraying polyurethane foam insulation in the Kernses' attic, yet consciously failed to take reasonable precautions to mitigate that risk (such as using lights and fans, stopping

---

juridical basis for such a determination, notwithstanding the existence of other plausible theories. Moreover, even if the manufacturing defect explanation were valid, plaintiffs' evidence still shows negligence by defendants in their response to the hazy, smoky, burning conditions in the home in the 20 to 30 minute interval preceding the outbreak of the fire, when defendants failed to call for help, failed to isolate and treat the source of smoke, and failed to vent the apparent hotspots.  As such, plaintiffs' evidence extends far beyond the conjecture of selecting between equally plausible alternative explanations, against which Alabama courts have railed.

application whenever the second team member was offsite, not spraying foam insulation in and around an eave into which they could not see, etc.).[17]  These facts give rise to an inference that defendants recklessly disregarded the risk, despite being conscious of it.  Moreover, defendants' conduct in the 20 to 30 minutes after they first noticed the smoky haze, the likes of which they had never seen before in applying foam insulation, and detected a burning odor is circumstantial evidence that they knew the house was about to catch fire.[18]  A reasonable factfinder could conclude that defendants' failure to summon emergency services and failure to locate and ventilate the hotspots in accordance with industry standards, despite having as long as 30 minutes in which to do so and despite actual awareness as to the area of the attic from which the smoke was emanating, amounted to breach of a duty despite actual knowledge of the conditions and conscious awareness that such breach would likely result in injury.

Under Alabama law, "[w]antonness is a question of fact for a jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness."  *Clark*, 2007 WL 431018, at *3 (citation omitted); *see also McDougle v. Shaddrix*, 534 So.2d 228, 231 (Ala. 1988) (same).  For the foregoing reasons, the Court cannot determine as a matter of law that there is a total failure of proof on plaintiffs' wantonness theory; accordingly, defendants' request for summary judgment is **denied** as to Count II.

###### C.      *Breach of Contract Claim.*

Defendants also seek summary judgment on the breach of contract claim set forth in Count III of the Amended Complaint.  "To establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own

---

[17]      Defendants misstate plaintiffs' position by accusing plaintiffs of "criticiz[ing] them for not being able to see into an area which could not be seen into."  (Defendants' Reply (doc. 54), at 8.)  Plaintiffs do not fault defendants for being unable to see into the eave area (except to the extent that use of artificial lighting could have enabled them to do so, which is not clear from the record).  But they do appropriately fault defendants for spraying foam insulation that gives off heat in an exothermic reaction in and around an unventilated, blocked eve area at the corner of the house, into which they were unable to see, particularly when competent evidence reflects that the fire emanated from that precise area.

[18]      This is particularly true given their extensive training and experience as full-time, professional firefighters.

performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Ex parte Coleman*, 861 So.2d 1080, 1085 (Ala. 2003) (citation omitted); *see also Hooper*, 956 So.2d at 1139 (same).  Defendants maintain, among other things, that Count III is baseless because plaintiffs cannot show that they performed under the subject contract, much less that defendants failed to perform.  These arguments are persuasive.

The purported "contract" in this case consists of nothing more than the one-page scribbled handwritten estimate of the job on Pro-Foam letterhead prepared by Sealy and dated September 25, 2005.  (Kerns Dep., at Exh. 4.)  The document has a bare minimum of verbiage and lists only the three components of the foam job, with itemized price for each, and a total price quote of $10,926.00.  (*Id.*)  The contract does not specify the order or time of performance.  Plaintiffs have never explained how they contend defendants violated this contract, except to say that the foam installation job was never completed.  They do not contend that Pro-Foam charged them for work it did not perform.  They do not contend that they ever paid a penny to Pro-Foam.  They do not contend that Pro-Foam provided them any warranties or guarantees that the foam application job would be performed in a certain manner or to a certain level of satisfaction.  They do not contend that Pro-Foam promised to indemnify them for any losses plaintiffs might sustain as a result of defendants' work.  They do not contend that the contract contains any implied terms and conditions, whether implied in law or in fact, with which Pro-Foam has not complied.  Rather, the salient facts are these: The parties agreed to the terms of a polyurethane foam installation job, but neither side performed.  Pro-Foam commenced performance, but never completed the foam installation job.  Plaintiffs never paid defendants any money.  Neither side ever demanded performance of the other.  Pro-Foam never sent plaintiffs an invoice.  Plaintiffs never asked Pro-Foam to return to the house and finish the job.  Neither side has tendered performance.  These circumstances strongly suggest that the contract has been abandoned.  *See, e.g.*, *Matthews v. S.A. Martin & Martin Motors*, 394 So.2d 943, 944 (Ala. 1981) ("mutual assent to abandon a contract may be inferred from all the circumstances surrounding their conduct").

Irrespective of the abandonment issue, plaintiffs have failed to articulate any basis for concluding that defendants are in breach of the September 25, 2005 contract.  At best from plaintiffs' perspective, the record reflects that neither side has performed its contractual obligations, in Pro-Foam's case to apply insulation and in plaintiffs' case to pay $10,926.00 for

the job.  Plaintiffs make no attempt to explain how such mutual non-performance is actionable on a breach of contract theory, much less to show how they have been damaged by Pro-Foam's failure to perform.  Instead, plaintiffs' breach of contract theory apparently begins and concludes with the proposition that the foam insulation job was never completed.[19]  Perhaps plaintiffs assume that Pro-Foam was obligated to perform first, without any need for plaintiffs to demand or tender performance; however, they offer no basis in law or fact for such an unstated assumption.  It may or may not be possible to tease out some kind of actionable Alabama breach of contract claim from these facts, but plaintiffs have made no legal arguments that would do so, and it is not the responsibility of this Court to formulate the parties' arguments for them.[20]  As presented by the parties, these facts and circumstances are not the stuff of a viable breach of contract claim.  Therefore, defendants are entitled to summary judgment on Count III of the Amended Complaint.[21]

---

[19]    Plaintiffs also suggest that Pro-Foam "acknowledged [its] breach of contract by never billing the Kerns for the work [it] performed."  (Plaintiffs' Brief, at 21.)  Far from constituting an admission of breach, Pro-Foam's failure to send the Kernses a bill results from the unremarkable and obvious proposition that the work was not completed.  Defendants' failure to bill the Kernses is no more indicative of a breach of contract than is the Kernses' failure to contact Pro-Foam to demand that they finish the job.

[20]    A court is not obligated to read minds or to construct arguments or theories of relief that counsel have failed to raise and that are not reasonably presented on the face of the pleadings.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); *see also Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 142 (3rd Cir. 2001) ("The ruling on a motion for summary judgment is to be made on the record the parties have actually presented, not on one potentially possible."); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (declaring that a "party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly, or else forever hold his peace," as district court may ignore arguments not adequately developed by nonmovant).  Clearly, "the onus is upon the parties to formulate arguments."  *Resolution Trust*, 43 F.3d at 599.

[21]    The Court's determination that there is no evidence that Pro-Foam breached any contractual obligations owed to the Kernses obviates the need to reach the parties' extensive arguments about whether defendant Sealy was a party to that contract or whether the Pro-Foam corporate veil can be pierced to hold Sealy liable for any breach of Pro-Foam's contractual obligations to plaintiffs.

**D.    *Damages Issues.***

Lastly, defendants devote more than eight pages of their brief to attacking various aspects of the Kernses' damages claims.  In particular, defendants seek summary judgment on the following aspects of plaintiffs' damages claims: (a) the adequacy of plaintiffs' documentation to support their "chart of expenses"; (b) plaintiffs' entitlement to damages for loss of income; (c) plaintiffs' entitlement for mileage for 24 round-trip drives from Atlanta to Gulf Shores during the clean-up and rebuilding process; (d) plaintiffs' ability to seek damages for "delay in retirement"; and (e) plaintiffs' entitlement to attorney's fees.  (Defendants' Brief, at 19-27.)[22]

---

[22]    In their Reply Brief (doc. 54), defendants attempt to augment their Rule 56 motion by arguing for the first time that they are entitled to summary judgment on the following additional aspects of plaintiffs' damages claims: (a) plaintiffs' claim for interest; (b) plaintiffs' claim for mental anguish; and (c) any aspect of plaintiffs' damages claims that would exceed the diminution in the value of the property caused by the fire.  It would be unfair and improper to consider these newly raised arguments at this time, when defendants could have raised them earlier and plaintiffs have not had an opportunity to be heard on them.  *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *Sweet v. Pfizer*, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("the moving party in a motion cannot submit new information as part of its Reply"); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not raise new arguments in a reply brief").  To the extent that defendants would argue that they were unable to raise their "diminution in value" argument earlier because it hinges on the newly decided case of *Poffenbarger v. Merit Energy Co.*, --- So.2d ----, 2007 WL 1378333 (Ala. May 11, 2007), the Court cannot agree.  In the first place, *Poffenbarger* is likely inapplicable because a reasonable reading of that opinion (which concerns an oil leak on a 32-acre tract of uninhabited, undeveloped woodlands) suggests that its rule is confined to circumstances in which the injury is to real property itself (*i.e.*, land, not to buildings or improvements on land).  Moreover, *Poffenbarger* did not purport to be announcing a change in Alabama's law of damages, and in fact its holding follows directly from prior precedents that were available when defendants filed their principal brief.  Finally, Alabama case law concerning the measure of damages in a tort action for damage to a building or other structure is well established (*see, e.g., S.S. Steele & Co. v. Pugh*, 473 So.2d 978 (Ala. 1985); *Dooley v. Ard Oil Co.*, 444 So.2d 847 (Ala. 1983); *Illinois Cent. R. Co. v. Elliott*, 82 So. 582 (Ala.App. 1919); *Southern Ry. Co. v. Slade*, 68 So. 867 (Ala. 1915)), yet defendants did not invoke these authorities in their initial summary judgment brief. They cannot do so for the first time in a reply brief, without satisfactory explanation and to the unfair detriment of non-movants.

The law in Alabama is quite clear that "[i]t is the plaintiff's burden to produce competent evidence establishing the existence of and amount of damages." *SouthTrust Bank v. Donely*, 925 So.2d 934, 943 (Ala. 2005); *see also Marcus v. Lindsey*, 592 So.2d 1045, 1046 (Ala. 1992). That said, there is no general requirement that proof of damages be in a particular form. For example, rather than submitting documentation or expert witnesses, a plaintiff may testify as to his own damages, "so long as his testimony is based on facts and does not present medical conclusions or opinions that require expert testimony." *Marcus*, 592 So.2d at 1046. The plaintiff's burden of proof on damages is merely to produce "sufficient evidence to allow the factfinder to calculate damages without basing its award on guesswork." *Livingston v. Tapscott*, 585 So.2d 839, 841 (Ala. 1991).

With respect to plaintiffs' spreadsheet of expenses, defendants balk that there is either no or insufficient documentation for certain of the dozens of line items on display. However, Plaintiffs' Exhibit I specifically identifies for each line item therein the vendor, the purpose of the expense, the date and amount of the expense, the Bates number or date of production of backup documentation, and the form of that documentation. As to all of the items listed in the spreadsheet appended to Plaintiffs' Exhibit I, all appearances are that plaintiffs have substantial evidence that each of those particular items of damage was actually incurred after and as a direct result of the fire; therefore, defendants' request to strike those line items as speculative, and for summary judgment to be granted in their favor as to those line items, is **denied**.[23]

Defendants also object to plaintiff Pauline Kerns' claim for damages of $10,000 for estimated loss of work, as presented in her Declaration dated June 6, 2007. Defendants insist that any such claim is speculative because Mrs. Kerns testified that she does not have specific documentation showing such a loss. (P. Kerns Dep., at 94-99.) Of course, nothing in Alabama's law of damages requires that damages be documented in writing. Mrs. Kerns' own testimony as

---

[23]     To the extent that defendants contend that there are discrepancies between the receipts/ backup provided and certain claimed expenses, they are free to present evidence of those discrepancies to the jury at trial and argue that those particular items of damages have not been sufficiently proven. For summary judgment purposes, however, the Court finds that plaintiffs have sufficiently documented their cleanup/repair/rebuilding damages to be entitled to present evidence of those expenses to the jury.

to the estimate and how it was calculated may be adequate to render that $10,000 figure neither imaginary nor speculative.  On this record, which is insufficiently developed by defendants as to this point, the Court will not bar plaintiffs from claiming that component of damages at trial.[24]

Defendants also seek summary judgment on plaintiffs' line item for mileage.  Plaintiffs' damages spreadsheet includes a line item for mileage computed as 24 round-trip drives from Atlanta to Gulf Shores, at 349 miles each way, times 48.5 cents per mile, for a total charge of $8,125.  (Plaintiffs' Exh. I.)[25]  Mrs. Kerns testified that those 24 trips constituted weekly trips that the Kernses made from their residence in Atlanta to Gulf Shores to supervise and oversee the cleanup and reconstruction process during the six-month period in which the house was restored to the state it was in prior to the fire.  (P. Kerns Dep., at 82-84.)  To the extent that defendants argue that these mileage expenses are speculative, the Court cannot agree.  Mrs. Kerns's testimony clearly establishes the frequency and purpose of these trips, and ties them directly to the fire.  Whatever infirmities the mileage claim might have, it is not so speculative that a jury cannot be allowed to hear it.  Nor does the Court find persuasive defendants' argument that the mileage item should be stricken as inequitable and redundant to plaintiffs' claim for six consecutive months of condominium rentals in the Gulf Shores area during the

---

[24]     Review of the cited portion of Mrs. Kerns's deposition transcript reflects that defense counsel did not probe into the basis for the $10,000 estimate other than to ask her about documentation and whether she can point to a single transaction that she lost because of the fire.  Because crucial follow-up questions were not asked, the Court cannot discern whether there is any reasonable methodology to how Mrs. Kerns arrived at that figure, or whether she was essentially pulling a number out of the air with no factual basis.  This gap in the record prevents defendants from meeting their burden under Rule 56; however, it will be incumbent on plaintiffs to fill that gap at trial with competent evidence supporting the $10,000 estimate and demonstrating that it is not speculative and not mere guesswork on the part of Mrs. Kerns.  If Mrs. Kerns cannot make such a showing at trial, then that aspect of plaintiffs' damages may not be submitted to the jury.

[25]     Plaintiffs' Exhibit I confirms that the Kernses only seek reimbursement for mileage at the IRS-approved rate of 48.5 cents per mile, not the higher 69 cents per mile rate that Mrs. Kerns claimed in her deposition.  Accordingly, to the extent that defendants' Motion for Summary Judgment is predicated on an objection that the 69 cents per mile multiplier is excessive, that objection is now **moot** because plaintiffs have made it clear that they claim only the IRS rate of 48.5 cents.

same time period.[26]  According to defendants, it is inequitable for plaintiffs to seek to recover both for mileage for 24 weekly round trips from Atlanta to Gulf Shores and for the cost of continuously renting a condominium during that six-month period.  Instead, defendants argue that plaintiffs should be limited to one or the other.  But plaintiffs have adequately explained the purported discrepancy by stating that work obligations in Atlanta precluded them from driving to Gulf Shores except on weekends, and that plaintiffs rented by the month, even though they were only in Gulf Shores on weekends, because it was cheaper to do that than to rent by the weekend. (P. Kerns Dep., at 116-17.)[27]  Plaintiffs cannot be barred from presenting their mileage and rental claims to the jury on the grounds identified by defendants' Motion for Summary Judgment.

Next, defendants seek to block plaintiffs from recovering damages for "delay in retirement" on the grounds that this theory is not legally cognizable and that it amounts to a double recovery because plaintiffs seek reimbursement of retirement savings used to rebuild the house while also seeking some unspecified recovery for the additional time they had to work to replenish those retirement savings.  By all appearances, however, this is a phantom issue that is not even part of this case.  It is true that both plaintiffs testified that their retirement had been delayed because they had had to continue working to replace retirement funds expended to clean up and rebuild after the fire.  (P. Kerns Dep., at 27-28; M. Kerns Dep., at 31-32.)  But neither of these deposition excerpts includes a statement that plaintiffs are suing defendants to recover for a delay in retirement.  Plaintiffs' damages spreadsheet does not include a line item for delayed retirement.  Mrs. Kerns's Declaration that accompanies the damages spreadsheet makes no mention of damages for delayed retirement.  (Plaintiffs' Exh. I.)  No discovery responses,

---

[26]    The damages spreadsheet confirms that plaintiffs are claiming condominium rental charges of $5,248 for this six-month period.  (Plaintiffs' Exh. I.)

[27]    This evidence is also fatal to defendants' summary judgment argument that plaintiffs failed, as a matter of law, to mitigate their damages when they rented a Gulf Shores condominium for more time than they actually spent in Gulf Shores.  (Defendants' Brief, at 22.) Plaintiffs' evidence is that, far from failing to mitigate damages, the continuous rental plan was actually a cost-saving measure that resulted in lower total rental bills than had defendants restricted their condo rentals to those 24 weekends.  Defendants' objection to the reasonableness or veracity of plaintiffs' explanation is patently a jury issue that is not amenable to resolution on summary judgment.

correspondence or other paper from plaintiffs' counsel identifies "delayed retirement" as a theory for damages that plaintiffs are seeking in this case.  In short, nothing in the court file that the Court can surmise would support a conclusion that the Kernses intend to ask the jury to award them some amount of money for Mr. Kerns's delayed retirement.  Accordingly, the Court need not address this question on summary judgment, and will not render an advisory opinion on how it might rule if in fact plaintiffs were to pursue such a theory.  *See, e.g., National Advertising Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes.").[28]

Finally, defendants take aim at plaintiffs' request for attorneys' fees, as claimed in their Amended Complaint (doc. 9).  Alabama law is quite clear that "There is no basis for the trial court to award expenses and/or attorney fees absent a contract allowing such an award, a statute authorizing such an award, or by special equity."  *Calvert v. Belcher*, 678 So.2d 795, 797 (Ala.Civ.App. 1996); *see also Hudman v. Wesson*, 792 So.2d 1113, 1117 (Ala.Civ.App. 2001) ("In Alabama, it is well established that one is entitled to an award of an attorney fee only if the award is authorized by statute, is provided for by the terms of a contract, or is justified by special equity.").  The Court discerns no such circumstances present in this case, and plaintiffs did not respond to defendants' request for summary judgment as it pertains to the attorney's fee issue.  Accordingly, it being apparent to the undersigned that there is no legal basis for an award of attorney's fees in this case, and plaintiffs having identified none in their brief, defendants' Motion for Summary Judgment is due to be **granted** as to that issue.

## IV.   Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.     Defendants' Motion to Strike Plaintiffs' Supplemental Evidentiary Filing (doc. 69) is **denied**.

2.     Defendants' Motion for Summary Judgment (doc. 31) is **granted in part**, and

---

[28]     All of that said, plaintiffs could have clarified the obvious confusion regarding the "delayed retirement" theory by simply stating in their opposition brief to the Motion for Summary Judgment whether they are or are not requesting an award of damages on that basis. Their silence serves only to exacerbate the murkiness of the matter.

**denied in part**.  The Motion is **granted** with respect to Count III (Breach of Contract) and Count IV (Res Ipsa Loquitur) of the Amended Complaint, and those claims are **dismissed**.  The Motion is further **granted** with respect to plaintiffs' claim for attorneys' fees, and that claim is **dismissed**.  In all other respects, the Motion is **denied**.

3.    The parties are reminded that the Final Pretrial Conference in this matter is set for July 17, 2007, at 10:30 a.m., with jury trial to follow in the August 2007 civil term.

DONE and ORDERED this 16th day of July, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE